The CHILDREN'S HOSPITAL OF
PHILADELPHIA, et al.

v.

The SECRETARY OF DEPARTMENT OF
PUBLIC WELFARE OF the COMMON-
WEALTH OF PENNSYLVANIA, et al.

Civ. A. No. 83–1520.

United States District Court,
E.D. Pennsylvania.

July 26, 1983.

---

Jennifer A. Stiller, King of Prussia, Pa., for plaintiffs.

John O.J. Shellenberger, Deputy Atty. Gen., Chief, Eastern Region, Philadelphia, Pa., for defendants.

## ORDER

McGLYNN, District Judge.

Six Pennsylvania hospitals[1] seek declaratory and injunctive relief in this action challenging a recent change in the method by which the Pennsylvania Department of Public Welfare ("DPW") sets reimbursement rates for inpatient hospital care of Medicaid beneficiaries. Pursuant to regulations promulgated by DPW on November 20, 1982, and approved by the Secretary of the Department of Health and Human Services ("HHS") on April 28, 1983,[2] Penn-

---

1. The original complaint was filed on March 31, 1983, by The Children's Hospital of Philadelphia, Presbyterian-University of Pennsylvania Medical Center, Allegheny General Hospital, and Harrisburg Hospital. By order dated May 10, 1983, I permitted Magee Rehabilitation Hos-

pital and Lewistown Hospital to intervene as additional plaintiffs.

2. Plaintiffs' original complaint challenged DPW's implementation of the regulations before receiving HHS approval. Between the

sylvania has placed a ceiling or "cap" of approximately 10% on increases in the per diem rates of reimbursement that hospitals receive. The cap is applied to both the interim per diem rates which the hospitals receive throughout the fiscal year and the final rates allowed after state audit of each hospital's annual Medicaid cost report. The matter is before me on plaintiffs' motion for a preliminary injunction. In seeking such preliminary relief, plaintiffs do not challenge the 10% cap itself but rather the propriety, under the federal Medicaid statute, Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq.*, of DPW's calculation of interim rates in a manner that does not take into consideration certain factors that are recognized in the calculation of the final rates. In addition, plaintiffs challenge the July 1, 1982 effective date of the new regulations and seek to enjoin DPW from recouping overpayments made to hospitals under the "uncapped" rates between July 1, 1982 and the implementation of the cap on November 20, 1982.

Hearings were held on May 10 and May 19, 1983. After careful consideration of the evidence presented and the arguments of the parties, I have determined that plaintiffs have not demonstrated that their claims merit preliminary injunctive relief. In support of this decision I make the following

## FINDINGS OF FACT

1. Plaintiffs are non-profit corporations organized and existing under the laws of the Commonwealth of Pennsylvania. All are licensed hospitals and are providers of hospital services under the Pennsylvania Medical Assistance ("Medicaid") Program.

2. Defendant Walter W. Cohen is the Secretary of the Department of Public Welfare, the state agency charged with responsibility for the administration of Pennsylvania's Medicaid Program.

3. The Commonwealth of Pennsylvania participates in the Medicaid program established by Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq.* ("the federal Medicaid law"), a cooperative federal-state program to provide payment for necessary medical services rendered to certain needy individuals whose income and resources are insufficient to meet the costs of these services.

4. To be eligible to receive federal matching funds, a state must submit a State Plan for Medical Assistance to HHS for its approval. The state plan must provide for reimbursement of hospital inpatient services in accordance with the federal Medicaid law and the regulations implementing the law.

5. Prior to August 13, 1981, the federal Medicaid law required that states pay hospitals the "reasonable cost" of rendering inpatient hospital services. On August 13, 1981, § 2173 of the Omnibus Budget Reconciliation Act of 1981 ("the 1981 Medicaid amendments") removed the requirement that states pay the "reasonable cost" of inpatient services and substituted the more flexible requirement that states pay for inpatient services:

> through the use of rates (determined in accordance with methods and standards developed by the State and which, in the case of hospitals, take into account the situation of hospitals which serve a disproportionate number of low income patients with special needs...) which the State finds, and makes assurances satisfactory to the Secretary [of HHS], are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities in order to provide care and services in conformity with applicable State and Federal laws, regulations, and quality and safety standards and to assure that individuals eligible for medical assistance have reasonable access (taking into account geographic location and reasonable travel

time of the filing of the complaint and the hearing on the motion for a preliminary injunction, HHS approved the materials submitted by DPW in connection with the new regulations.

Plaintiffs' have therefore withdrawn this claim. Plaintiffs' Memorandum of Law, filed 5/11/83, Docket Entry No. 14.

time) to inpatient hospital services of adequate quality. . . .

42 U.S.C. § 1396a(a)(13)(A) as amended.

6. The federal regulations implementing 42 U.S.C. § 1396a(a)(13)(A) are codified in 42 C.F.R. part 447. The regulations require that when a state Medicaid agency wishes to make a significant change in its methods and standards for determining reimbursement rates, it must submit certain enumerated findings, assurances, and related information to the Secretary of HHS ("the Secretary") 42 C.F.R. § 447.255.

7. The necessary findings, *id.* § 447.-252(b), assurances, *id.* § 447.252(c), and related information, *id.* § 447.255(b), (hereafter collectively referred to as "assurances") are designed to inform the Secretary that the new rates are reasonable and adequate under the federal Medicaid law.

8. The assurances must be "satisfactory to the Secretary". *Id.* § 447.252(c).

9. The Secretary has delegated authority to the Health Care Financing Administration ("HCFA") to administer the federal side of the Medicaid program. HCFA reviews the assurances submitted by the state agency and notifies the state agency within 60 days as to whether they are acceptable. If HCFA does not notify the agency within 60 days, the assurances are deemed accepted. *Id.* § 447.256(a).

10. A proposed payment rate supported by assurances that have been accepted or deemed accepted is effective on the date specified by the state agency in the assurances, *id.* § 447.256(b)(1), but in no event will the effective date be earlier than "the first day of the calendar quarter in which the agency submits the assurances and related information described in § 447.255." *Id.* § 447.256(b)(2).

11. DPW makes periodic interim payments for inpatient hospital services over the course of the fiscal year. Such interim payments are determined by multiplying the hospital's Medicaid "interim per diem rate" by the number of days of care rendered to Medicaid beneficiaries for the applicable period.

12. Before the implementation of the regulations at issue here, DPW derived a hospital's "interim per diem rate" from the hospital's Blue Cross per diem rate. Blue Cross bases its hospital rates on cost data submitted periodically by each hospital.

13. A hospital's total allowable costs for a fiscal year are determined on the basis of an audit of the costs submitted by the hospital to DPW. A final "audited per diem rate" is calculated by dividing total allowable costs by total allowable Medicaid days for the fiscal year.

14. Based on a comparison of final audited costs and the amount of interim payments already received, DPW determines whether it has overpaid or underpaid a hospital with its interim payments.

15. The parties agree that under the current audit process, it may take as long as three years for a hospital that is overpaid or underpaid in a given fiscal year to reach final settlement with DPW on total reimbursable costs for the fiscal year.

16. An internal DPW study of the 106 hospitals whose 1980–81 costs had been audited as of May 12, 1983, revealed that 45 hospitals had been underpaid a total of approximately $2.7 million and 61 hospitals had been overpaid a total of approximately $8.4 million by DPW's 1980–81 interim payments.

17. Because of the continuing growth in Medicaid expenditures and reductions in federal funding, DPW decided to develop cost containment measures for fiscal 1982–83.

18. Based on research done by the staff of DPW's Office of Medical Assistance, DPW initially determined to limit the increase in each hospital's audited per diem rate to approximately 8% over the hospital's 1981–82 audited rate. The principal basis for this determination was a projection by Data Resources, Inc., an econometric forecasting firm serving as a consultant to DPW, that for fiscal year 1982–83 the Consumer Price Index for all urban consumers would increase by about 7.8% and that hos-

pital inpatient general routine operating costs would increase by about 7.9%.

19. Federal Medicaid law requires that hospital reimbursement rates "take into account the situation of hospitals which serve a disproportionate number of low income patients with special needs[.]" 42 U.S.C. § 1396a(a)(13)(A). Such hospitals are called "exceptional" hospitals; all others are "regular" hospitals.

20. Based on estimates made by the Office of Medical Assistance, Children's Hospital of Philadelphia, Presbyterian-University of Pennsylvania Medical Center and possibly Magee Rehabilitation Hospital will be exceptional hospitals.

21. Proposed regulations were published in the Pennsylvania Bulletin on May 15, 1982, with an explanation and an invitation for comments. The proposed regulations provided for a 7.8% cap on both interim and audited rate increases for regular hospitals and an 8.1% cap on increases for hospitals that qualified as exceptional hospitals.

22. During the comment period DPW revised the proposed regulations to reflect the comments received and discussions held with the hospital subcommittee of the Medical Assistance Advisory Committee. The primary concerns of the hospitals were: (a) that the limits were too low; (b) that the difference of .3% between the regular hospital cap and the exceptional hospital cap was inadequate to account for hospitals that serve a disproportionate number of low income patients; and (c) that hospitals which had put major newly constructed projects into operation in 1982 would suffer financial hardship because the 1982–83 rate cap would not take into account the added interest and depreciation costs included in 1982–83 allowable costs but, since the projects had not yet been put into operation, not included in the calculation of 1981–82 rates.

23. The revised regulations, as implemented by publication as final rulemaking on November 20, 1982, provide:

(a) For fiscal year 1982–83, DPW will not pay an interim per diem rate to any hospital (regular or exceptional) that exceeds by more than 10% the hospital's average interim per diem rate for the preceding fiscal year. A hospital's average interim per diem rate is computed by dividing the hospital's total Medicaid payments for the preceding fiscal year plus any third party or recipient payments by the hospital's total Medicaid days for that fiscal year.

(b) The final audited per diem rate for regular hospitals will be subject to a limit of 9.8% over the hospital's audited per diem rate established for the preceding fiscal year. The limit for exceptional hospitals is 10.5%.

(c) Increased depreciation and interest costs incurred by hospitals with newly constructed projects which had not begun operating until 1982–83 are recognized and exempted from the payment limits if they meet certain criteria. This exemption applies to final audited rates only and not to the calculation of interim per diem rates.

(d) These special additional capital costs will be paid at final audit without regard to the cap if they are otherwise reimbursable; if they are related to a new construction project that has received a certificate of need, that has gone into operation in fiscal year 1982–83, and that relates to patient care; and if the hospital's total costs have increased by more than 15% over 1981–82 and the rate of increase in capital costs exceeds the rate of increase in operating costs.

24. On September 28, 1982, DPW submitted to HCFA its proposed amendments to the state Medicaid plan along with assurances that the limits on increases in per diem rates would produce reasonable and adequate rates for hospital inpatient services provided under the plan.

25. The proposed amendments submitted with the assurances on September 28, 1982, were substantially the same as the regulations promulgated on November 20, 1982, except that the proposed amendments

used the interim rates in effect on June 30, 1982 as the base for the 10% interim rate cap rather than the average interim per diem rate for the preceding fiscal year (1981–82).

26. The regulations promulgated on November 20, 1982, were made effective retroactive to July 1, 1982, the first day of the calendar quarter that includes September 28. DPW announced that it would recoup any payments made after July 1, 1982, under the uncapped rates, that exceeded what a hospital would have been paid under the caps.

27. On November 24, 1982, the Regional Administrator of HCFA wrote to DPW requesting "further clarification or development" of certain items in the assurances "before we can approve each of the amendments." In its assurances DPW had stated that it believed that the 9.8% ceiling would allow for reasonable and adequate rates. HCFA asked if the word "believes" constituted a finding as required by the federal regulations. Second, HCFA requested that DPW make it clear that its findings and assurances also applied to the 10.5% limit on final rate increases for exceptional hospitals. Third, HCFA noted that DPW had estimated the average interim rate with the cap in effect but had not estimated the average final audited rate. Recognizing that the 1981–82 audits had not been completed, HCFA suggested that DPW estimate the average rate before the implementation of the 9.8%/10.5% cap and then estimate the average rate with the cap in effect. Finally, HCFA requested that, as required by the federal regulations, DPW specify that the rates would in no event be higher than those paid under Medicare.

28. By letter dated March 7, 1983, DPW supplied the clarifications and further development of the assurances by confirming that its "belief" was a finding that limiting per diem rate increases to 9.8% would allow for reasonable and adequate rates and clarifying that it made the same finding for the 10.5% limit for exceptional hospitals. The letter also estimated the average per diem rates before and after the cap.

29. A subsequent letter from DPW dated April 19, 1983 informed HCFA that Pennsylvania's rates would not result in payments that exceed the amount payable under Medicare.

30. DPW did not submit a specific finding that the 10% cap on interim rates would allow for reasonable and adequate rates on an interim basis.

31. HCFA did not object to or question the absence of such a finding on the interim rate cap.

32. By letter dated April 28, 1983, HCFA approved the state plan amendment and accepted the assurances on the reasonableness and adequacy of the new rates. The notice of approval stated that the assurances had been received on September 30, 1982 and approved on April 28, 1983. The notice also stated that the effective date of the plan amendment was July 1, 1982.

33. Each plaintiff's interim rate has reached its applicable ceiling. The interim per diem rates of plaintiffs Children's Hospital, Presbyterian-University of Pennsylvania Medical Center, Lewistown Hospital, and Magee Rehabilitation Hospital reached and exceeded their applicable ceilings some time between July 1, 1982 and November 20, 1982.

## DISCUSSION

The purpose of a preliminary injunction is to maintain the status quo pending final resolution of the litigation. It is not granted as a matter of right. The moving party must demonstrate both a reasonable probability of success in the litigation and immediate irreparable injury *pendente lite* in the absence of such relief. The court may also consider the effect of the injunction on the non-moving party and the effect on the public interest. *Kershner v. Mazurkiewicz,* 670 F.2d 440, 443 (3d Cir.1982) (en banc); *Continental Group, Inc. v. Amoco Chemical Corp.,* 614 F.2d 351, 359 (3d Cir.1980). Because I find that plaintiffs have demonstrated neither a reasonable probability of eventual success nor irreparable harm *pen-*

*dente lite* with respect to either the effective date of the regulations or the propriety of the interim rates, I will deny the motion for a preliminary injunction. I need not proceed to examine the effect on other interested parties or on the public interest.

### A. Effective Date of the Regulations

The crux of this issue is whether the submission of assurances on September 28, 1982, was sufficient to trigger the effective date provision of 42 C.F.R. § 447.256(b).[3] If so, DPW's regulations were properly made effective July 1, 1982, despite the clarification and further development requested by HCFA. If not, the effective date must be January 1, 1983, the first day of the calendar quarter containing March 7, 1983, the day DPW submitted its clarified assurances.

At the outset I note that when Congress amended the Medicaid statute in 1981, it deleted the requirement that the methods and standards of payment developed by the state agency be "reviewed and approved by the Secretary and (after notice of approval by the Secretary) included in the plan[.]" 42 U.S.C. § 1396a(a)(13)(D) (repealed). The current statutory provision, *see* Finding of Fact No. 5, *supra,* contains no such explicit prior approval language. In fact, it does not contain any language that suggests that the *methods and standards* of payment be approved by the Secretary. The state agency need only make assurances that the resulting *rates* are reasonable and adequate under federal law. This change in the statutory language has been held to permit enforcement of amendments to a state Medicaid plan before the Secretary has determined that the assurances are satisfacto-

ry. *Magee-Womens Hospital v. Heckler,* 562 F.Supp. 483 (W.D.Pa.1983).[4]

The current statutory language requiring that assurances be made to the Secretary is not intended to be burdensome. In enacting the new requirement, Congress expressed its intention that

> the Secretary will keep regulatory and other requirements to the minimum necessary to assure proper accountability, and not to overburden the States and facilities with unnecessary and burdensome paperwork requirements. It is expected that the assurances made by the States will be considered satisfactory in the absence of a formal finding to the contrary by the Secretary.

S.Rep. No. 139, 97th Cong., 1st Sess. at 478, *reprinted in* 1981 U.S.Code Cong. & Ad. News 396, 744. Although I do not regard it as dispositive, I note that there was no formal finding that the September 28 assurances were unsatisfactory. The HCFA letter implied that the assurances *would* be satisfactory if their meaning was clarified and some additional language and rate estimation added. The originally submitted assurances were neither approved nor disapproved but were held in abeyance pending clarification by DPW. I begin my analysis, then, with a recognition that Congress has moved in the direction of diminished federal oversight and broadened state agency discretion in Medicaid reimbursement.

The federal regulations, at 42 C.F.R. § 447.256(b)(2), *see* note 3, *supra,* do put a limit on the permissible effective date of amendments to state Medicaid plans. However, the regulations are somewhat vague and indirect as to what triggers the effective date provision. The plaintiffs will pre-

---

3. § 447.256(b) provides:
   (b) *Effective date.* (1) Except as specified in paragraph (b)(2) of this section, a proposed payment rate with respect to which HCFA has accepted assurances or with respect to which an assurance has been deemed accepted under this section will be effective on the date specified in the agency's assurances. (2) A payment rate with respect to which HCFA has accepted assurances or with respect to which an assurance has been deemed accepted under this section will not

be effective for any period beginning before the first day of the calendar quarter in which the agency submits the assurances and related information described in § 447.255.

4. The *Magee-Womens Hospital* case involved the same Medicaid rate cap regulations at issue here. The question of prior federal approval was withdrawn by the plaintiffs from the present litigation after HCFA approved the assurances on April 28, 1983. *See* note 1, *supra.*

vail if none but the fully clarified, finally accepted assurances can be the trigger.[5]

Section 447.256(b)(2) of 42 C.F.R. says only that the assurances which, when submitted, fix the earliest effective date are "the assurances and related information described in § 447.255." Section 447.255 lists the related information that must be submitted, but its description of the assurances is limited to the requirement that "the assurances in § 447.252(c)" must be submitted "before the end of the calendar quarter that includes the date on which the rate has been in effect for one year, or whenever the agency wishes to make a significant change in its methods and standards for determining the rate, whichever is earlier." It is only in § 447.252(c) that the assurances are listed and the phrase "satisfactory to the Secretary" appears.[6]

While the question is somewhat close, I find two significant reasons for concluding that plaintiffs are not likely to prevail on the issue of whether the September 28 assurances are the ones referred to in § 447.256(b)(2) as those "described in § 447.255." First, subsection (a) of § 447.256 also refers to "the assurances described in paragraph (c) of § 447.252 and related information described in paragraph (b) of § 447.255." HCFA is given 60 days from the date it receives these assurances to notify the state agency as to whether the assurances are acceptable. Clearly, subsection (a) is referring to originally submitted assurances. Absent unequivocal language to the contrary in subsection (b), it is logical to conclude that the use of the same phrase is intended to describe the same entity (i.e. as yet unaccepted assurances). It is true that

subsection (b) pertains only to the effective date of rates "with respect to which HCFA has accepted assurances", but the subsection does not repeat the phrase to specify that only the submission of the finally "accepted" assurances fixes the earliest effective date. See note 3, supra. It says only "the assurances and related information described in § 447.255." If HHS intended § 447.256(b)(2) to be construed as plaintiffs contend, it could easily have added the same kind of "accepted" language to the end of the subsection that it put in the beginning. The plaintiffs have not met their burden of showing that their interpretation of § 447.256(b)(2) is the one that is likely to prevail.

Second, absent contrary higher authority, courts generally give great deference to a federal administrative agency's interpretation of its own regulations. *Lucas Coal Co. v. Interior Board of Mine Operations Appeals,* 522 F.2d 581 (3d Cir.1975). The above discussion has proceeded on plaintiffs' assumption that there have been two "submissions" here, one on September 28, 1982, and another on March 7, 1983. HCFA's notice of approval, however, shows that the federal agency considered that there had only been one submission. The notice of approval states that the submitted material had been received on September 30, 1982 and approved on April 28, 1983. Moreover, the notice itself says that the effective date of the approved material is July 1, 1982. HHS wrote the federal regulations at issue here. In light of the agency's interpretation of its own regulations, I cannot say that plaintiffs have shown a

---

**5.** Plaintiffs argue that if any but the finally accepted assurances may determine the effective date, state agencies could submit woefully inadequate assurances to secure the earliest possible effective date. That is not this case. My holding does not extend beyond situations where, as here, the originally submitted assurances are substantially similar to those finally accepted, differing only in choice of words and amount of clarification. It is significant that DPW's September 28 submission did not fail to address any of the assurances listed in § 447.252(c). Neither does my holding apply to an initial set of assurances that is formally disap-

proved rather than, as here, held in abeyance until further clarified and developed by the state agency.

**6.** § 447.252(c) provides:

(c) *State assurances.* The Medicaid agency must make assurances satisfactory to the Secretary that the requirements of paragraphs (a)(1), (a)(iii)(3), (b), and (f) are met and that in making significant changes in its methods and standards for determining payment rates, it has complied with the public notice requirements in § 447.254.

reasonable probability of success on the merits.

On the question of irreparable injury, it appears that plaintiffs will only suffer financial damage if the effective date is found to be July 1, 1982. DPW will recoup any overpayments made under the uncapped rates between the effective date of the cap (July 1, 1982) and its implementation (November 20, 1982). As discussed more fully below, it is well-settled that monetary loss alone does not constitute the kind of injury essential to the granting of a preliminary injunction. *Rumbaugh v. Beck,* 491 F.Supp. 511, 517 (E.D.Pa.1980), aff'd, 636 F.2d 1210 (3d Cir.1980); *Salsburg's Meats, Inc. v. Shultz,* 363 F.Supp. 269, 273 (E.D.Pa.1973); *see also Oburn v. Shapp,* 521 F.2d 142, 151 (3d Cir.1975). Accordingly, I find that plaintiffs have not shown that irreparable injury will result in the absence of a preliminary injunction enjoining DPW from recouping overpayments made after July 1, 1982.

### B. Interim Rates

In pressing their motion for a preliminary injunction, plaintiffs do not challenge the rate caps themselves. Nor do they contend that the final audits will not correct any underpayments made by the current interim rates. Their sole complaint is that until final audit—perhaps three years down the road—they are being reimbursed at interim rates that, for them, are significantly lower than what their final audited rates will be. The result is a present cash-flow shortage. It is reasonable to assume that if the state audit process did not take so long to complete, these hospitals would not be in court.

The principal reasons that the interim rates of these particular hospitals are lower than their probable final rates are that under the interim rate cap, unlike the cap on audited rates, (1) regular and exceptional hospitals are treated the same; and (2) capital costs on major projects put into operation during the fiscal year ("special capital costs") are not exempt. Plaintiffs' argument is that because they are exceptional hospitals or because they have put major construction projects into service in the past fiscal year, the across-the-board 10% interim rate cap deprives them, pending final audit, of adequate reimbursement under federal Medicaid law. Plaintiffs want the interim rate cap to take into consideration the same factors that will be recognized at final audit.

A court's review of nonadjudicatory federal or state administrative agency action is a limited one. As explained by the Fifth Circuit in a case involving a challenge by Mississippi hospitals to that state's ceiling on reimbursement of Medicaid's share of hospital operating costs:

Mississippi's reimbursement plan is the product of research and policy decisions by federal and state agencies. These agencies are authorized by statute to develop Medicaid's payment schemes. The function and expertise of the federal courts in this sphere is limited, and our role does not extend to reweighing or rethinking the political and financial concerns behind a particular payment plan.

*Mississippi Hospital Association, Inc. v. Heckler,* 701 F.2d 511, 516 (5th Cir.1983). The plaintiffs can only succeed on the merits if they show that DPW's interim rate cap is arbitrary, capricious or in violation of law.[7] *See id.; Baltimore & Ohio C.T.R. Co. v. U.S.,* 583 F.2d 678, 684–85 (3d Cir.1978), *cert. denied,* 440 U.S. 968, 99 S.Ct. 1520, 59 L.Ed.2d 784 (1979).

The 1981 federal Medicaid amendments made two related changes in Medicaid reimbursement. Beginning in fiscal 1982 there will be an annual percentage reduction in the federal funds a state will receive for Medicaid reimbursement, 42 U.S.C. § 1396b(s)(1)(A), unless the state can meet specified Medicaid expenditure targets, *id.* § 1396b(t). In order to help the states contain Medicaid expenditures and deal with the federal reductions, Congress provided

---

**7.** As did the court in *Mississippi Hospital Association,* I will assume without deciding that a federal court is entitled to review the actions of a state agency administering federal Medicaid funding in the same manner that it would review the actions of a federal agency.

for increased flexibility in hospital reimbursement by replacing the "reasonable cost" standard with the standard recited above in Finding of Fact No. 5. The House Energy and Commerce Committee reported that the revised standard was intended "to provide the States with flexibility to implement alternative reimbursement systems to contain costs." H.R.Rep. No. 158, 97th Cong., 1st Sess., *reprinted in* 4 CCH Medicare & Medicaid Guide ¶ 24,486. Indeed, the Conference Committee specifically recognized that "States may limit increases to the increases that result from price increases for goods and services purchased by hospitals, as measured by such indices as the national hospital input price index, for example." H.Conf.Rep. No. 208, 97th Cong., 1st Sess., *reprinted in* 1981 U.S.Code Cong. & Ad.News at 1324. It was just such a projection of inflation index that DPW used as a basis for its original 7.8/8.1% ceiling—ultimately raised to 9.8/10.5% after discussions with representatives of the hospital industry. It is thus beyond question that Congress has authorized the states to implement the type of cost containment scheme embodied in DPW's new regulations.

It is clear from the present record that DPW did not make a separate, formal assurance to the Secretary that the 10% cap on interim rates would produce reasonable and adequate rates on an interim basis. DPW argues that because the federal Medicaid statute, unlike the Medicare statute, at 42 U.S.C. § 1395g(a), does not provide for, require, or even mention interim rates, any method of interim payment by the states is beyond review. This argument would, *a fortiori,* preclude any requirement that assurances be made when the method is significantly changed. The counter-argument, of course, is that since the statute says, "payment ... through the use of rates ... which the State finds, and makes assurances satisfactory to the Secretary, are reasonable and adequate ..." (emphasis added), Pennsylvania must take care that any rates (interim or final) it chooses to employ satisfy the federal requirements. Although there is some appeal to this latter argument in view of the fact that Pennsyl-

vania hospitals may not receive their final rates for three years, I need not decide, under the facts of the present case, whether DPW committed a procedural error. DPW's uncontradicted evidence shows that it considered its originally proposed cap of 7.8/8.1% to be reasonable and adequate and that it was only as a concession to the hospitals that it exempted special capital costs at final audit. The original proposal did not contain any such exemption for either the interim or the final rate calculations. Moreover, DPW's findings and assurances were accepted by HHS, the federal agency empowered to enforce Medicaid standards, even though the assurances were only made with regard to the final rates. HCFA's request for clarification stated that the assurances should "reflect" all the changes in the plan (i.e. both interim and final rate caps) but only asked that the submitted material make it clear that the findings "pertain[ed]" to the 9.8% and 10.5% caps on final rates.

Because of its position on the lower proposed cap, there can be no doubt that DPW would have made a "reasonable and adequate" finding on the interim rate cap if it had been requested to do so by HCFA. Since the procedural issue was not pressed by the parties, I will not decide whether the absence of such a finding somehow violates the federal statute. In any event, since HCFA did not ask for such a finding and ultimately approved the submitted materials without the finding, I cannot say that plaintiffs have shown a reasonable probability of succeeding on this procedural issue.

The crux of plaintiffs' case at this time is their substantive complaint that the 10% interim rate cap deprives them of interim reimbursement that is, in the language of the statute, "reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities in order to provide care and services in conformity with applicable State and Federal laws, regulations, and quality and safety standards[.]" 42 U.S.C. § 1396a (a)(13)(A). I am assuming for purposes of ruling on this motion that, whether

or not states are procedurally required to submit assurances on interim rates, the rates themselves must conform to the federal standard.

I begin with the language of the statute. Although I have not uncovered any case that so construes this new reimbursement standard, it could be interpreted to mean that the only cost increases that must be reimbursed are those increases over which hospitals have no control ("that must be incurred . . ."), for example, those resulting from inflation. I do not see the need to read the statute so narrowly, but I recognize that the use of the clause "costs which must be incurred by efficiently and economically operated facilities" suggests a primary concern for operating costs. It stretches the language of the statute to contend that the costs of constructing a new patient wing or of purchasing new CAT-scan equipment are costs that *must* be incurred by an efficiently and economically operated hospital.[8] The statutory standard itself thus suggests that Pennsylvania's exemption of special capital costs at final audit is more than the federal law would require.

■ The nature and purpose of interim rates show that it is neither arbitrary nor capricious for DPW to wait until final audit to recognize special capital costs and to consider the needs of exceptional hospitals. Interim rates are designed to approximate final rates. In the interest of prompt payment and minimization of paperwork requirements, DPW has historically based its interim rates on the rates established by Blue Cross. It is with the same interests in mind that DPW has streamlined the interim rate cap. Determining which hospitals are exceptional hospitals requires a comparison of all hospitals in the state to ascertain which ones serve a "disproportionate" number of low income patients. It is not unreasonable for DPW to determine that this comparison is more readily done at the time

of final audit. Likewise, including the special capital cost exemption in the interim rate calculation would require an audit of each hospital's costs before each interim payment to determine if the hospital's capital costs qualified for the exemption. It would defeat the purpose of interim payments to encumber the process with cost audits and statewide comparisons of Medicaid hospital utilization.

My determination that these plaintiffs have not shown a reasonable probability of success in this litigation is buttressed by the decisions of other courts that have reached the same conclusion in cases involving similar and ever more burdensome cost containment provisions. *See, e.g., Mississippi Hospital Association, Inc. v. Heckler,* 701 F.2d 511 (5th Cir.1983) (ceiling on operating cost reimbursement set at 80th percentile based on comparison of each hospital's operating costs); *Coalition of Michigan Nursing Homes, Inc. v. Dempsey,* 537 F.Supp. 451 (E.D.Mich.1982) (reduction in allowable "profit factor" permitted for long term care facilities that keep their costs below 80th percentile ceiling); *Hempstead General Hospital v. Whalen,* 474 F.Supp. 398 (E.D.N.Y.1979), *aff'd,* 622 F.2d 573 (2d Cir.1980) (reimbursement on capital cost component limited to net depreciated value of a preowned facility rather than purchase price).

■ There is no dispute that these hospitals will recover at final audit the balance of any underpayment made through the use of the capped interim rates. Their loss is short-term and certainly not irreparable. Financial loss alone does not rise to the level of irreparable injury that merits injunctive relief. *See* cases cited *supra* at 1011. There are a number of avenues through which these plaintiffs can remedy any cash-flow shortage pending final audit. After final audit the hospitals may administratively appeal DPW's application of the rate ceilings.

**8.** I recognize that the special capital costs that will be exempted from the cap at final audit must be related to a project that has received a certificate of need. It does not follow, however, that mere receipt of a certificate of need permits the underlying costs to be characterized as costs that "must be incurred".

Plaintiffs' complaint asserts that because of the hardship caused by DPW's regulations, they may be forced to take actions to make up for the revenue shortfall—actions which will have a direct impact on the access and quality of patient care. Specifically, Plaintiffs are seriously considering: employee layoffs and work hour cutbacks; borrowing of working capital (leading to increased costs in the form of interest expense); reduction in Medicaid-intensive outpatient services; restricting hours or total closure of emergency room. Plaintiffs' Complaint, filed 3/31/83, Docket Entry No. 1, ¶ 54. Plaintiffs have not presented any evidence that the quality of patient care has decreased because of resort to such cutbacks and reductions. Indeed, there was no evidence that such drastic cutbacks and reductions have been made. I do not mean to minimize the financial difficulties that Pennsylvania's new Medicaid regulations have imposed on these particular hospitals, but I am not convinced that the harm is irreparable.

## CONCLUSIONS OF LAW

1. The court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331.

2. The plaintiffs have not shown a reasonable probability of success on the merits on either the issue of the effective date of Pennsylvania's Medicaid rate caps or the propriety under federal law of the interim rates after application of the cap.

3. The plaintiffs have not shown that they will be irreparably harmed *pendente lite* in the absence of a preliminary injunction in their favor.

4. Plaintiffs' motion for a preliminary injunction will be denied.