552 A.2d 720

Grandview Health Homes, Inc., Gold Star Nursing Homes, Inc., Petitioner *v.* Commonwealth of Pennsylvania, Department of Public Welfare, Respondent.

Argued November 1, 1988, before Judges Craig and Palladino, and Senior Judge Barbieri, sitting as a panel of three.

*Barbara G. Graybill,* with her, *Suzanne Rauer, Charles O. Barto, Jr. and Associates,* for petitioner.

*Bruce G. Baron,* Assistant Counsel, for respondent.

OPINION BY JUDGE PALLADINO, December 27, 1988:

Grandview Health Homes, Inc. (Petitioner) appeals from a decision of the Department of Public Welfare, Office of Hearings and Appeals (DPW) denying Petitioner's exceptions to disallowances of certain costs, for Medical Assistance (MA) reimbursement purposes, at its Milton, Danville and Grandview Facilities (Facilities) in the cost reporting periods ending June 30, 1980, 1981, and 1982.

Reimbursement for skilled nursing and intermediate care services provided to MA patients for the time periods involved in this case is pursuant to the regulations in DPW's Medical Assistance Manual for Allowable Cost Reimbursement for Skilled Nursing and Intermediate Care Facilities (Manual) found at 8 Pa. B. 2826-2838 (1978) and 10 Pa. B. 3106 (1980).[1] The allowable reimbursement is composed of three components —operating costs, depreciation on capital assets, and interest on capital indebtedness. Manual section III.E., 8 Pa. B. 2833 (1978). The instant appeal involves the depreciation on capital assets and interest on capital indebtedness components.

---

[1] The Manual was codified on July 1, 1983 at 55 Pa. Code §§1181.201-1181.274. Because codification was subsequent to the cost reporting periods involved in this case, only Manual and Pennsylvania Bulletin cites will be used.

Petitioner purchased the Facilities from Gold Star Nursing Homes, Inc. (Gold Star) on December 20, 1979 for $4,000,000 plus $60,000 for an additional 22 acres of land. To obtain the funds for this purchase, Petitioner floated a $4,950,000 bond issue at 9% interest. The bonds were issued with an original bond discount (prepaid financing) of 6%. While Gold Star owned the Facilities, it took $764,113 in straight line depreciation, which was comprised of $308,210 for Danville, $157,938 for Milton, and $297,965 for Grandview. The Grandview facility included a 50 bed residential unit (the Pavilion) that, at the time of acquisition by Petitioner, was not certified for MA participation. Certification for the Pavilion's 50 beds was obtained in March 1981.

The issues before us in this appeal[2] concern: (1) the disallowance of interest on capital indebtedness offset by Gold Star's depreciation; (2) the offset of Gold Star's depreciation of the Pavilion against the purchase price allotted to the Pavilion to determine the Pavilion's cost basis for depreciation purposes; (3) the disallowance of depreciation resulting from DPW's use of Gold Star's assigned asset lives and use of compiled cost bases for groups of assets in calculating allowable depreciation; and (4) the disallowance of interest expense offset by income on bond redemption. Petitioner contends that DPW's interpretation of the Manual regulations and/or DPW's methods of calculating the allowable reimbursements resulting in these disallowances were improper. We will address each issue separately.

_____

[2] Our scope of review is limited to a determination of whether the decision is supported by substantial evidence, is in accordance with the law, and whether any constitutional rights have been violated. *Harston Hall Nursing and Convalescent Home, Inc. v. Department of Public Welfare*, 99 Pa. Commonwealth Ct. 475, 513 A.2d 1097 (1986).

## I. Prior Owner's Depreciation Offset

Petitioner contends that DPW improperly offset Gold Star's depreciation against interest on capital indebtedness in determining Petitioner's allowable interest expense reimbursement. Petitioner argues that while prior owner depreciation is required to be deducted from the price of a facility purchased as an ongoing operation to determine the cost basis for purposes of calculating allowable depreciation, Manual section IV. D.9.f., 8 Pa. B. 2836 (1978),[3] no such requirement appears in the interest allowance section of the Manual, Manual section IV.D.10., 8 Pa. B. 2836-2837,[4] and that it is improper to interpret the Manual as so requiring.

This court addressed the issue of whether DPW could offset prior owner depreciation against interest on capital indebtedness in *Grand Oak Nursing Home, Inc. v. Department of Public Welfare*, 116 Pa. Commonwealth Ct. 453, 541 A.2d 800 (1986), *aff'd*, 518 Pa. 54, 540 A.2d 265 (1988), and held that such action was proper. In reaching that conclusion, the court read Manual section IV.D.10. in conjunction with section 203 of the Medicare Provider Reimbursement Manual (HIM-15). Section 203 of HIM-15 provides, in pertinent part, that "[w]here a loan is obtained to finance the purchase of a facility . . . and the purchase price exceeds the . . . cost basis, . . . interest expense on that portion of the loan used to finance the excess . . . is not allowable." Section IV of the Manual states that the guidelines and policies of HIM-15 are to be followed where the Manual is silent. 8 Pa. B. 2834 (1978), 10 Pa.

---

[3] *See infra* Section II.

[4] Manual section IV.D.10. contains eight subsections, a-h, and none require that prior owner depreciation be offset from the purchase price in determining the amount of allowable interest on capital indebtedness.

B. 3107 (1980).[5] Petitioner asks that we reconsider our decision in *Grand Oak* in light of the facts in the instant case. However, Petitioner points to no factual differences, and we decline to reconsider the legal analysis. DPW did not err in offsetting Gold Star's depreciation against Petitioner's interest expense.

Petitioner then contends that even if the offset of Gold Star's depreciation against the Facilities' interest expense was proper, DPW's computation of that offset was improper. Petitioner redeems the bonds issued to finance the purchase of the facilities according to a set schedule. Each time there is a bond redemption, Petitioner must pay the interest due. In calculating what portion of this interest is attributable to Gold Star's depreciation, Petitioner asserts that DPW multiplied the

---

[5] Manual section IV, 8 Pa. B. 2834 (1978), prefaces the regulations in that section by stating:

> The standards listed below are established to provide guidance in determining whether certain, selected cost items will be recognized as allowable costs. In the absence of specific instructions or guidelines in this Manual, facilities will follow the guidelines and policies in the Medicare Provider Reimbursement Manual contained in HIM 15.

This section was amended in 1980, 10 Pa. B. 3107, to read as follows:

> The Department shall determine provider's allowable costs in accordance with the following:
> (a) The Department's Manual for Allowable Cost Reimbursement for Skilled Nursing and Intermediate Care Facilities and,
> (b) The Medicare Provider Reimbursement Manual (HIM-15), except that where the Department's Manual and the HIM-15 differ, the Department's Manual shall govern.

DPW considers the 1980 amendment merely clarification of its interpretation of the 1978 language that HIM-15 is used only in the absence of specific instructions in the Manual. Hearing Officer adjudication discussion section at 8.

interest paid at each bond redemption by a percentage obtained from dividing Gold Star's depreciation by the amount of the bond issue outstanding at the time of that particular redemption. N.T. at 41. Petitioner contends that because of the continuing reduction of the denominator, the percentage of interest expense disallowed gets larger at each redemption and results in a disallowance greater than that attributable to prior owner depreciation. We need not determine whether such a method of calculating prior owner depreciation offset against interest on capital indebtedness is proper because that is not the method DPW testified it used.[6]

DPW's auditor testified that the prior owner depreciation offset against Petitioner's interest expense was calculated by multiplying the interest paid on each bond redemption by a *set* percentage. This percentage was obtained by dividing Gold Star's depreciation by the total purchase price. N.T. at 18. Clearly this method reflects a constant disallowance of that amount of the purchase price attributable to the prior owner's depreciation at each bond redemption and is not improper.

## II.  PAVILION

Petitioner contends that the Pavilion is not subject to the prior owner depreciation offset to purchase price in determining cost basis, required by Manual section IV. D. 9. f., because the Pavilion was not certified for participation at the time Petitioner purchased the Facilities and because Gold Star had never been reimbursed for depreciation on the Pavilion. Petitioner asserts that as of March, 1981, when the Pavilion's beds were certified for MA participation, it should be able to claim, as an allowable expense, depreciation on the amount of the ac-

---

[6] Petitioner submitted no evidence to support its version of how DPW calculated this offset.

tual purchase price of the Facilities attributable to the Pavilion.

DPW asserts that Manual section IV.D.9.f. is applicable to the Pavilion because the Pavilion was an asset of the Grandview facility, purchased as an ongoing operation. DPW's interpretation of its own regulation must be upheld unless (1) it is plainly erroneous or inconsistent with the regulation or (2) contrary to the enabling statute. *Department of Public Welfare v. Forbes Health System,* 492 Pa. 77, 422 A.2d 480 (1980). Manual section IV.D.9.f. (emphasis added) states:

> The cost basis for depreciable assets of a facility purchased as an ongoing operation shall be the lesser of the purchase price or the fair market value based on the lesser of at least two bona fide appraisals at the time of the sale and *less any straight line depreciation by the prior owner*. The sale must be an arm's length transaction consummated in the open market between nonrelated parties in a normal buyer-seller relationship.

First, Petitioner argues that the Pavilion is not subject to the prior owner depreciation offset because at the time of Petitioner's purchase of the Facilities, the Pavilion was not "a facility purchased as an ongoing operation." DPW does not consider the Pavilion a separate facility but a part of the Grandview facility—*i.e.* one of the assets of an ongoing operation. DPW interprets Manual section IV.D.9.f. as applying to all the assets which are part of "a facility purchased as an ongoing operation" even when all the assets of the facility were not being used to provide services to MA participants when the facility was purchased.

Petitioner acknowledges that the Pavilion, while not certified for MA participation, was being used as a private pay skilled nursing unit at the time of purchase

and after purchase until it received MA certification. Petitioner's brief at 34. It was part of the ongoing operation purchased and continued by Petitioner. DPW's interpretation of its regulation that the Pavilion was a part of the "ongoing operation" of the Grandview facility is not clearly erroneous nor inconsistent with Manual section IV.D.9.f.

Petitioner next asserts that DPW's interpretation is inconsistent with the federal mandate under which Pennsylvania operates its MA program.[7] 42 U.S.C. §§1396-1396s. In particular, Petitioner cites 42 U.S.C. §1396a(a)(13)(A) which provides that the rates established for MA participating facilities are to be "reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities in order to provide care and services in conformity with applicable state and Federal laws, regulations and quality and safety standards." Petitioner argues that because payment for depreciation is a component of allowable MA reimbursement for costs incurred in providing services to MA recipients in Pennsylvania, subtracting Gold Star's depreciation of the Pavilion (for which Gold Star did not receive MA reimbursement) from the purchase price allocated to the Pavilion in Determining the Pavilion's cost basis for depreciation is a denial of reasonable and adequate compensation for services provided. We cannot agree.

Initially, we note that there is no federal law requirement that depreciation be reimbursed. Under current Manual provisions, depreciation is not an allowable cost (with certain exceptions) with respect to new beds

---

[7] Medical Assistance is a jointly funded federal-state program to provide medical care to the needy. States which elect to participate receive federal funds and are required to meet the federal statutory requirements in 42 U.S.C. §§1396-1396s. *See Harris v. McRae,* 448 U.S. 297 (1980).

put into service after March 1, 1986. 55 Pa. Code §1181.259(r)(1). This preclusion has been held not to violate federal requirements. *Wilmac Corp., v. Heckler,* 633 F. Supp. 1000 (E.D. Pa. 1986), *vacated on other grounds,* 811 F.2d 809 (3d Cir. 1987). Also, this court has previously determined that the fact that application of Manual section IV.D.9.f. "will in certain instances result in the failure to permit total depreciation of the original cost basis of a facility . . . is not enough to warrant an invalidation of the rule by this Court." *Mountain Rest Nursing Home, Inc. v. Department of Public Welfare,* 73 Pa. Commonwealth Ct. 42, 48, 457 A.2d 600, 603 (1983). Therefore, Petitioner's reliance on the fact that Gold Star received no depreciation reimbursement for the Pavilion, in and of itself, has no bearing on whether DPW's offset of Gold Star's depreciation on the Pavilion against Petitioner's allowable depreciation for the Grandview facility was a denial of reasonable and adequate compensation for services provided.

When a challenge is made that a state regulation is contrary to the federal mandate that the rates paid to MA providers be reasonable and adequate to meet the costs incurred in serving MA participants, the burden is on the provider to show that the *rates as a whole* are not, as required by 42 U.S.C. §1396a(a)(13)(A), "reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities." *Friedman v. Perales,* 668 F. Supp. 216 (S.D. N.Y. 1987), *aff'd,* 841 F.2d 47 (2d Cir. 1988). Petitioner presented no evidence to demonstrate that the disallowance of Gold Star's depreciation for the Pavilion made insufficient the rate at which Petitioner was reimbursed for services provided to MA patients at the Grandview facility. Nor did Petitioner attempt to demonstrate that the disallowance of prior owner depreciation from the assets not previously certified for MA participation

resulted in unreasonable and inadequate rates in general. *See Friedman.* We conclude that DPW's interpretation of Manual section IV.D.9.f. is not contrary to 42 U.S.C. §1396a(a)(13)(A).

### III. DEPRECIATION DISALLOWANCE

A portion of DPW's disallowance of the depreciation claimed by the Facilities as an allowable cost resulted from DPW's use, in calculating allowable depreciation, of (1) useful lives for the Facilities' assets assigned by Gold Star rather than those assigned by Petitioner and (2) compiled cost bases for large groups of assets rather than the cost basis of individual assets. Petitioner contends that these methods are inconsistent with Manual section IV.D.9.a., 8 Pa. B. 2836 (1978). This regulation states, in pertinent part:

> The straight-line method of depreciation must be used. Accelerated methods of depreciation are not acceptable. The amount of annual depreciation is determined by first reducing the cost of the asset [cost basis] by any salvage value and then dividing by the number of years of useful life of the asset. The useful life may be shorter than the physical life depending upon the usefulness of the particular asset to the provider. Facilities shall follow the guidelines on useful life published by the Internal Revenue Service [IRS] or the Uniform Chart of Accounts and Definitions for Hospitals published by the American Hospital Association [AHA].

. . .

### A. Asset lives

Petitioner asserts that the lives it assigned to the purchased assets were consistent with AHA guidelines

and, therefore, DPW's use of Gold Star's assigned useful lives was improper. DPW counters that Manual section IV.D.9.a. cannot be considered in a vacuum. DPW relies on Manual section IV.D.9.b., 8 Pa. B. 2836 (1978), to support its use of Gold Star's assigned useful lives in calculating the Facilities' allowable depreciation cost.

Manual section IV.D.9.b. states that "[t]he method and procedure for computing depreciation must be applied from year-to-year on a consistent basis." DPW interprets Manual sections IV.D.9.a. and b. as requiring a prior owner's assigned lives for purchased assets to be used as long as those lives are consistent with either IRS or AHA guidelines. In *Millville Health Center, Inc. v. Department of Public Welfare*, 114 Pa. Commonwealth Ct. 169, 538 A.2d 625 (1988), this court faced the issue of whether DPW's use of the useful asset lives assigned by a prior owner, as opposed to those assigned by the new owner, was proper. However, the court was unable to resolve the issue because neither the hearing officer nor the Office of Hearings and Appeals in that case had taken a position "on DPW's contention that, under its regulations, the new purchaser of an ongoing facility may not relife the fixed assets of that facility." *Id.* at 175, 538 A.2d 625, 628. In this case, the hearing officer concluded that "DPW's adjustment of the useful lives of the capital assets was neither plainly erroneous nor inconsistent with the Cost Manual." Hearing officer conclusion of law 10. Therefore, we will address the issue in this case.

Petitioner argues that because there is no specific prohibition in any of the subsections to Manual section IV.D.9. (the regulation setting forth the conditions under which depreciation is an allowable cost) against the assignment of new lives to purchased capital assets by a new owner, DPW may not replace asset lives assigned by a new owner with the prior owner's assigned asset

lives.[8] Petitioner asserts that the only restriction pertaining to useful lives is that they be in accordance with IRS or AHA guidelines, which, Petitioner alleges, the useful lives it assigned to the purchased assets were.[9] We do not agree.

Manual section IV.D.9.b. clearly requires that the method and procedure used for computing depreciation must be consistent year-to-year. If asset lives were permitted to be changed, the method and procedure of calculating depreciation would not be consistent. Manual section IV.D.9.a. conditions depreciation allowance on a requirement that asset lives be in accordance with IRS or AHA guidelines. These two regulations must be read together in order to *give effect to both*. *See* 1 Pa. C. S.

---

[8] Petitioner references 42 C.F.R. §413.314(b)(7) as support for this argument. This federal regulation permits depreciation as an allowable cost and requires that assets acquired before January 1, 1981 be depreciated using IRS or AHA guidelines. 42 C.F.R. §413 (b)(7)(ii). This requirement is also found in section 104.17 of HIM-15. Section 104.17 of HIM-15 also permits a different useful life than that set forth in the IRS or AHA guidelines if properly supported. The Manual does not and, therefore, this HIM-15 provision conflicts with the Manual and does not apply in Pennsylvania. Manual section IV, 8 Pa. B. 2834 (1978) and 10 Pa. B. 3107 (1980). Section 122 of HIM-15 does permit a change in assigned asset life "when clear and convincing evidence justifies a redetermination" and written approval is obtained. Petitioner makes no argument that section 122 of HIM-15 is applicable here or that a change in assigned life was sought.

[9] The record contains no evidence to support Petitioner's assertion that the lives it assigned are in accordance with AHA guidelines. We note that there is also no evidence in the record at all as to what the assets were or what the prior owner's assigned lives were. Petitioner asserted at the hearing that the prior owner's assigned lives, as used by DPW, were not in accordance with AHA guidelines. However, Petitioner does not raise that issue before us and, in fact, raises no issue with respect to there not being substantial evidence to support the hearing officer's findings of fact.

§§1922(2) and 1932. Therefore, if the prior owner did *not* assign asset lives consistent with either IRS or AHA guidelines, a new owner may assign new lives consistent with IRS and AHA guidelines. However, if the prior owner *did* assign lives consistent with IRS or AHA guidelines, DPW's use of the prior owner's assigned asset lives in calculating a facility's allowable depreciation gives effect to both Manual section IV.D.9.a. and Manual section IV.D.9.b. and is clearly consistent with Manual section IV.D.9.a. We conclude that DPW's use of Gold Star's assigned capital asset lives in calculating the Facilities' allowable depreciation was not improper.

## B. Grouping

In calculating the allowable depreciation at Petitioner's Milton and Danville facilities, DPW calculated allowable depreciation using compiled cost bases for large groupings of assets rather than calculating allowable depreciation using the cost basis of each asset. N.T. at 21. Petitioner challenges this method on the basis that it is not in conformity with generally accepted accounting principles (GAAP) and, therefore, is inconsistent with the Manual.[10] The hearing officer concluded that using a compiled cost basis for assets with the same useful life when computing straight line depreciation was not erroneous nor inconsistent with the Manual's regulations. Hearing officer adjudication discussion section at 9 and conclusion of law 9.

Manual section III.B., 8 Pa. B. 2833 (1978) and 10 Pa. B. 3108 (1980), states: "The facility will identify for

---

[10] This methodology should make no difference in the allowable depreciation. Petitioner contended at the hearing that it does because Gold Star over-appreciated early assets. N.T. at 46. As previously noted, failure to permit total depreciation is not enough to invalidate DPW's interpretation of its regulation. *Mountain Rest.*

cost finding allowable direct, indirect ancillary, and related organization costs applying to patient care based on generally accepted accounting principles." This section requires facilities to use GAAP to identify and report costs. It does not require that DPW use GAAP in determining if the costs are allowable. The Pennsylvania Supreme Court, in *Fair Winds Manor v. Department of Public Welfare,* 517 Pa. 106, 535 A.2d 42 (1987), considered the assertion that because DPW's application of its interpretation of a regulation was not in accordance with GAAP the method could not be used. In dismissing the argument, the court stated: "Since the policies underlying applicable state regulations used to determine allowable cost reimbursement for skilled nursing and intermediate care facilities differ sharply from financial accounting requirements, the superficial appeal of this argument cannot sustain it." *Id.* at 114, 535 A.2d at 46. Failure to follow GAAP does not render a method used for calculating allowable depreciation improper.

## IV. INCOME ON BOND REDEMPTION

In November 1981, Petitioner redeemed some of the bonds issued to purchase the Facilities. The bonds had a face value of $60,000; Petitioner redeemed them for $52,100. Petitioner reported $7900 as income gain on bond redemption. DPW offset it against the Facilities' allowable interest on capital indebtedness. Petitioner admits that income from a bond redemption should be offset against interest on capital indebtedness. N.T. at 51-52. However, Petitioner asserts that $3600 of the $7900 was not income but rather a return of the 6% original bond discount. Petitioner indicated at the hearing that documents supporting this assertion would be submitted. N.T. at 52. No such documents appear in the record.

Petitioner has the burden of proving that the auditor's adjustment was incorrect. *Harston Hall Nursing and Convalescent Home, Inc. v. Department of Public Welfare,* 99 Pa. Commonwealth Ct. 475, 513 A.2d 1097 (1986). Petitioner admits that the offset here was, in part, proper. Petitioner offered no documentation to show that part of the $7900 it reported as income was really return of prepaid financing. Petitioner has failed to meet its burden of proving that offset of the entire amount was incorrect.

## V. CONCLUSION

The decision of DPW is affirmed.

## ORDER

AND NOW, December 27, 1988, the decision of the Department of Public Welfare in the above-captioned case is affirmed.