558 A.2d 125

Citizens General Hospital, Petitioner *v.* Commonwealth of Pennsylvania, Department of Public Welfare, Respondent.

Argued February 6, 1989, before Judges CRAIG and PALLADINO, and Senior Judge NARICK, sitting as a panel of three.

*Andrew E. Thurman, Berkman, Ruslander, Pohl, Lieber & Engel,* for petitioner.

*Bruce G. Baron,* Assistant Counsel, for repondent.

OPINION BY JUDGE CRAIG, April 25, 1989:

Citizens General Hospital (Citizens or the hospital) appeals from an order of the Office of Hearings and Appeals of the Department of Public Welfare (DPW)[1]

---

[1] The order of the Office of Hearings and Appeals adopted in its entirety the recommendation of an attorney examiner.

that denied the hospital's appeal from DPW's disallowance of certain costs claimed by the hospital for reimbursement under the Pennsylvania Medical Assistance Program for the fiscal year ending June 30, 1983.

Specifically, Citizens challenges the application to it of DPW regulations in effect for the period in question that (1) established a cap on the final audited per diem rate of reimbursement for a "regular" hospital such as Citizens[2] of 9.8% over the hospital's audited per diem rate for the preceding fiscal year[3] and (2) excluded from that rate cap depreciation and interest expenses relating to a newly constructed project that began operating during the year being audited, but only if the hospital's overall audited costs increased by more than 15% over those of the preceding fiscal year.[4]

The issue is whether, as the hospital contends, DPW's disallowance of costs relating to patient care and to the construction of a new energy plant was arbitrary and capricious or violated the mandate in the federal legislation establishing the Medicaid program[5] that state plans implementing the program must provide for rates of reimbursement that are reasonable and adequate to meet the costs that must be incurred by efficiently and economically operated facilities in order to provide appropriate care and medical services to Medicaid patients, where

---

[2] The DPW regulations classify hospitals as being either regular or exceptional, the latter being those that serve a disproportionate number of medical assistance patients. Citizens does not challenge DPW's classification of it as a regular hospital.

[3] Medical Assistance Manual §9421.55, 12 Pa. B. 3980, November 20, 1982, effective July 1, 1982. Because DPW has replaced the system of reimbursement involved in this case with a completely different system, based on the concept of "diagnosis related groups" and implemented by new codified regulations, only Manual and Pennsylvania Bulletin citations will be used.

[4] Medical Assistance Manual §9421.56, 12 Pa. B. 3981.

[5] Title XIX of the Social Security Act, 42 U.S.C. §§1396-1396s.

the attorney examiner expressly found that Citizens was an efficient provider.

## *History*

After a hearing and the submission of briefs by the parties, the attorney examiner issued a recommendation in which he found that Citizens was an efficient health care provider compared with others both locally and nationally, according to several sources (Findings of Fact Nos. 1-3), that Citizens had added a new and more efficient energy plant in 1983 (F.F. No. 4), and that the hospital had reduced the average length of stay for obstetrical/maternity patients in 1983 (F.F. No. 5). He found further that the hospital experienced an increase in reimbursable costs for 1983 over those of 1982 that was 62% higher than any other year-to-year increase from fiscal 1981 through fiscal 1984 (F.F. No. 6), that the hospital paid medical malpractice claims attributable to Medicaid patients during fiscal 1983 (F.F. No. 7), that it incurred substantial new costs in the construction of its energy plant (F.F. No. 8) and experienced an increase of over 70% in the costs of high intensity Medicaid patients during that year (F.F. No. 9). By contrast, fiscal 1982 was an unusually low cost year, in which the hospital paid no medical malpractice claims, incurred no capital costs for new construction and served a low number of high intensity Medicaid patients (F.F. No. 10). Although the referee made no express finding on the point, DPW did not contest the hospital's claim that its overall audited costs for 1983 were 14.9% higher than those for 1982.

After summarizing the arguments of the parties, the attorney examiner concluded: (1) There was no authority to support the hospital's claim that the regulatory cap on reimbursement of 9.8% over the costs for the preceding fiscal year was arbitrary and capricious because it failed to provide for a representative base year (determined by

averaging costs for several years), and the regulations could not be invalidated simply because a method different from the one chosen by the agency would produce a result more beneficial to a particular hospital or might appear to be a better method for addressing the subject matter; (2) the 15% threshold for reimbursement of capital costs could not be held to be irrational where a federal district court had considered the provision and had stated that it was more than federal law would require in terms of accommodating hospitals with exceptional circumstances; and (3) where DPW's regulations had been duly promulgated and had been held by a federal court to have been properly accepted by the Department of Health and Human Services (HHS)—the federal agency empowered to enforce Medicaid standards—the regulations were presumptively reasonable and adequate to meet the costs that must be incurred by efficiently and economically operated facilities as required by the federal legislation, in that Congress did not intend that any particular provider found to be efficient must be reimbursed for all costs it actually incurred.

## Background

Between 1972 and 1981 federal law required states to pay hospitals the "reasonable cost" of rendering inpatient hospital services.[6] On August 13, 1981, section 2173 of the Omnibus Budget Reconciliation Act of 1981[7] replaced the reasonable cost standard for payments to hospitals with that contained in the "Boren Amendment" (adopted by Congress the previous year with regard to payments to

---

[6] Congress adopted the reasonable cost standard in the 1972 amendments to the Social Security Act, Pub. L. No. 92-603, §232, 86 Stat. 1329, 1410 (1972), as a means of containing costs that were rising under the previous system of reimbursement, which in practice reimbursed hospitals for whatever cost of inpatient services they actually incurred. *California Hospital Ass'n v. Obledo*, 602 F.2d 1357, 1359 (9th Cir. 1979).

[7] Pub. L. No. 97-35, §2173, 95 Stat. 357, 808-09 (1981).

skilled nursing and intermediate care facilities). As so amended, 42 U.S.C. §1396a(a)(13)(A) requires that a state plan for medical assistance must provide for payments to hospitals

> through the use of rates (determined in accordance with methods and standards developed by the State) ... which the State finds, and makes reasonable assurances satisfactory to the Secretary [of HHS], are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities in order to provide care and services in conformity with applicable State and Federal laws, regulations, and quality and safety standards and to assure that individuals eligible for medical assistance have reasonable access ... to inpatient hospital services of adequate quality ... .

The change in standards was an effort by Congress to contain rising Medicaid costs and to give the states greater flexibility in setting reimbursement rates in the light of reductions in the portion of Medicaid funding paid by the federal government. *Friedman v. Perales*, 668 F. Supp. 216, 222 (S.D.N.Y. 1987), *aff'd*, 841 F.2d 47 (2d Cir. 1988).[8]

### State Law Issues

DPW promulgated the regulations at issue in this case pursuant to legislative rulemaking power conferred upon it by sections 201 and 403 of the Public Welfare Code.[9] An agency's exercise of such legislative rulemak-

---

[8] Section 2161(a) of the Omnibus Budget Reconciliation Act of 1981, 95 Stat. 357, 803-04, reduced the amount of federal payments to which a state would otherwise be entitled by 3% in fiscal 1982, 4% in fiscal 1983 and 4.5% in fiscal 1984, with some provisions enabling a state to take actions that would reduce, but not eliminate, the reduction in payments.

[9] Act of June 13, 1967, P.L. 31, *as amended*, 62 P.S. §§201 and 403. Section 201(2) empowers DPW, with the approval of the gover-

ing power (as contrasted with interpretive rulemaking power) "·'is valid and is as binding upon a court as a statute if it is (a) within the granted power, '(b) issued pursuant to proper procedure, and (c) reasonable.' " *Pennsylvania Human Relations Commission v. Uniontown Area School District*, 455 Pa. 52, 76-77, 313 A.2d 156, 169 (1973) (quoting K.C. Davis, 1 Administrative Law Treatise §5.03 at 299 (1958)). Our Supreme Court also said:

> A court, in reviewing such a regulation, 'is not at liberty to substitute its own discretion for that of administrative officers who have kept within the bounds of their administrative powers. To show that these have been exceeded in the field of action ... involved, it is not enough that the prescribed system of accounts shall appear to be unwise or burdensome or inferior to another. Error or unwisdom is not equivalent to abuse. What has been ordered must appear to be "so entirely at odds with fundamental principles ... as to be the expression of a whim rather than an exercise of judgment." '

*Id.* at 77, 313 A.2d at 169 (quoting *American Telephone & Telegraph Co. v. United States*, 299 U.S. 232, 236-37

nor, "to develop and submit State plans or other proposals to the Federal government, *to promulgate regulations, establish and enforce standards* and to take such other measures as may be necessary to render the Commonwealth eligible for available Federal funds or other assistance." (Emphasis added.) Section 403(b) provides in part that "[t]he department shall establish rules, regulations and standards, consistent with the law, as to eligibility for assistance and *as to its nature and extent*." (Emphasis added.) Where the federal statute to be implemented grants the states great flexibility in establishing plans for reimbursement, the state legislature's grant of authority to DPW to establish standards governing reimbursement and to determine the nature and extent of eligibility constitutes a grant of legislative policymaking power to the agency.

(1936)). *See also Mountain Rest Nursing Home, Inc. v. Department of Public Welfare,* 73 Pa. Commonwealth Ct. 42, 457 A.2d 600 (1983) *and Centennial Spring Health Care Center v. Department of Public Welfare,* 115 Pa. Commonwealth Ct. 450, 541 A.2d 806 (1988) (Duly promulgated state regulation for administering the Medicaid program is presumptively valid under federal and state law, and the Commonwealth Court will not disturb DPW's exercise of administrative discretion in the absence of fraud, bad faith, abuse of discretion or clearly arbitrary action.).

Citizens first argues that Medical Assistance Manual §9421.55(b) was arbitrary and capricious in establishing a maximum increase of 9.8% over the final audited per diem rate of a hospital's preceding fiscal year (rather than a more nearly representative base year) without considering extraordinary circumstances. Citizens experienced costs relating to payment of a Medicaid malpractice claim in 1983 but not in 1982 and a case mix involving a substantial increase in the number and costs of high intensity Medicaid patients in 1983 over those of 1982.

DPW adopted the 9.8% audited per diem rate cap for regular hospitals after receiving public comments on its initial proposal, which provided for a 7.8% cap. DPW also made provision for separate recognition of depreciation and interest costs relating to new construction in response to public comments, but as to other special costs, the agency said, in the preamble to the publication of these regulations:

> Several respondents commented that the limit did not take into account certain special costs incurred by some hospitals. Examples of special costs included special hospital programs, education costs and costs related to case mix.

> Since the limit of 7.8% originally presented in the proposed regulations was based on legitimate

> econometric forecasts for hospitals, we believe that the temporary limit of an average of 10% will account for these and any other similar costs incurred by hospitals.

12 Pa. B. 3978. DPW did consider the kinds of concerns articulated by Citizens and then made a decision within its administrative discretion. Its action in setting the rate increase cap at 9.8% of the rate for the preceding year, allowing for only certain enumerated exceptions, was not "the expression of a whim"—to use the words quoted by our Supreme Court.

The hospital next contends that the threshold for receiving reimbursement for costs relating to new construction contained in Medical Assistance Manual §9421-.56(c)(1), requiring an increase of over 15% in a hospital's overall audited costs from those of the preceding fiscal year, was arbitrary and capricious and penalized Citizens for its efficiency in keeping its overall increase in costs, at 14.9%, slightly below that threshold, despite the capital costs it incurred for the construction of its new energy plant. The hospital notes that in *Mississippi Hospital Ass'n v. Heckler*, 701 F.2d 511 (5th Cir. 1983), the Fifth Circuit upheld Mississippi's state plan against a similar challenge by hospitals in part because the plan provided an exceptions procedure allowing hospitals to seek rate adjustments based on atypical case mixes, extraordinary circumstances or costs of improvements incurred after the rates were set.

However, the plan involved in that case classified hospitals according to bed-size and determined allowable operating costs capped at the 80th percentile of all hospitals within a particular class. Because 42 U.S.C. §1396a (a)(13)(A) also requires that state plans set rates that "in the case of hospitals, take into account the situation of hospitals which serve a disproportionate number of low income patients with special needs", the exceptions pro-

cedure described was necessary to provide the mandated consideration of overall case mix. As noted above, DPW's plan addressed this issue by classifying hospitals as being regular or exceptional.

DPW responds to the charge of arbitrariness with regard to the 15% threshold for reimbursement of construction costs by noting that federal courts have held that state plans are not required to permit any exceptions to a general cost limit, citing *Colorado Health Care Ass'n v. Colorado Department of Social Services,* 842 F.2d 1158 (10th Cir. 1988) and *Friedman v. Perales,* and that a federal court that considered the plan at issue in this case (in the context of ruling on a motion for a preliminary injunction to prevent enforcement of certain other provisions of the plan), stated:

> It stretches the language of the statute to contend that the costs of constructing a new patient wing or of purchasing new CAT-scan equipment are costs that *must* be incurred by an efficiently and economically operated hospital. The statutory standard itself thus suggests that Pennsylvania's exemption of special capital costs at final audit is more than the federal law would require.

*Children's Hospital of Philadelphia v. Secretary of Department of Public Welfare,* 568 F. Supp. 1001, 1011 (E.D. Pa. 1983). In the view of the attorney examiner, a regulation that provided more than the federal law would require could not be arbitrary and capricious. R. 10.

As with the 9.8% per diem rate cap discussed above, the preamble to DPW's publication of these regulations indicates that DPW adopted the provision giving special treatment to certain capital construction costs in response to comments received after publication of the proposed regulations. 12 Pa. B. 3987. The persuasive comments of the federal court in *Children's Hospital* coupled with the

evidence of DPW's adoption of the threshold after consideration of public comments convince this court that DPW's action in adopting the 15% threshold also was not arbitrary.

The hospital claims that, where its overall expenses came very close to the threshold increase necessary for construction cost reimbursement, the hospital is being *penalized* for its efficiency; *i.e.*, had the hospital been less efficient its increase would have exceeded the threshold and it would have qualified for reimbursement of these costs. However, such is the nature of thresholds in general. DPW made a reasoned decision within its administrative discretion to define and to protect hospitals that might suffer severe financial hardship because of construction project expenses under a rigid application of the new regulations. Citizens has not demonstrated that the standard chosen by DPW was arbitrary and capricious.

### *Federal Law Issues*

Citizens raises the same issues discussed above in the context of an argument that DPW's regulations "as applied" violate the mandate in the amended version of section 1396a(a)(13)(A) of the Social Security Act that state plans set rates that are "reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities ... ." Citizens contends that the quoted statutory language means that, once Citizens was found to be an efficient provider of inpatient hospital services, then all of the expenses it actually incurred were those that "must be incurred" by an efficient hospital, and §1396a(a)(13)(A) requires that Citizens be reimbursed for those actual expenses.

In essence, Citizens' argument is a rejection of the notion of class-based rates. However, both the legislative history of §1396a(a)(13)(A) and the consistent interpretation of that section by the federal courts demonstrate that

the hospital's position is incorrect. The Senate Report accompanying the legislation that established the new standard expressly approved state rates formulated on a geographic or class basis, and review by the Secretary of HSS of the aggregate amounts paid to hospitals under the state plan. S. Rep. No. 139, 97th Congress, 1st Sess. 478, *reprinted in* 1981 U.S. Code Cong. & Admin. News 396, 744. In addition, the report of the Conference Committee that reported the bill stated, "It is also recognized that States may limit increases to the increases that result from price increases for goods and services purchased by hospitals, as measured by such indices as the national hospital input price index, for example." H.R. Conf. Rep. No. 208, 97th Cong., 1st Sess. 962, *reprinted in* 1981 U.S. Code Cong. & Admin. News 1010, 1324. The federal district court in *Children's Hospital,* noting that DPW had based its per diem rate cap on a projection of such an inflation index, said, "It is thus beyond question that Congress has authorized the states to implement the type of cost containment scheme embodied in DPW's new regulations." 568 F. Supp. at 1010.

In *Friedman v. Perales,* 668 F. Supp. 216 (S.D.N.Y. 1987), *aff'd,* 841 F.2d 47 (2d Cir. 1988), the court considered a challenge to the plan under which the New York Department of Social Services reimbursed residential health care facilities (also covered by §1396a(a)(13)(A)), in particular, the provision that limited the real property cost component of a provider's reimbursement to an appropriate rental value set by the state Department of Health, regardless of whether an individual provider's rental costs were higher. Construing the new standard established by the Boren Amendment, the court said:

> Rates required to meet a standard of reasonableness may fall within a zone of reasonableness. Wisconsin Hospital Association v. Reivitz, [733 F.2d 1226, 1223 (7th Cir. 1984)] (citing Federal

Power Commission v. Conway Corp., 426 U.S. 271, 96 S.Ct. 1999, 48 L.Ed.2d 626 (1976)). Moreover, as Judge GAGLIARDI recognized, because the new standard is premised on the costs which would be incurred by an economically and efficiently run facility, *the states are free to formulate class-wide reimbursement regulations based on the costs of rational groupings of provider facilities....*

*Under an efficient cost standard, the states need not reimburse individual providers for costs they actually or even reasonably incur. ...* Moreover, as they could have under the previous reasonable cost standard, *states may still set benchmark rates for efficient costs by establishing fixed ceilings or caps.*

*Friedman v. Perales,* 668 F. Supp. at 222-23 (citations omitted and emphasis added).

Recently, citing *Friedman v. Perales,* this court held:

When a challenge is made that a state regulation is contrary to the federal mandate that the rates paid to [Medical Assistance] providers be reasonable and adequate to meet the costs incurred in serving MA participants, the burden is on the provider to show that the *rates as a whole* are not, as required by 42 U.S.C. §1396a(a)(13) (A), 'reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities.'

*Grandview Health Homes, Inc. v. Department of Public Welfare,* 122 Pa. Commonwealth Ct. 356, 365, 552 A.2d 720, 725 (1988) (emphasis in original).

Although Citizens asserts in its reply brief that it does not claim that the DPW regulations are inherently irrational or arbitrary, but are faulty only as specifically applied to Citizens, the hospital fails to explain how the

"application" differs from the face of the regulations. Medical Assistance Manual §9421.55 established the 9.8% cap on increases in per diem rates over each hospital's preceding year's rate with full recognition by DPW that the circumstances of different hospitals would differ with regard to special expenses. Section 9421.56 established the 15% threshold for reimbursement of construction costs in a conscious effort by DPW to establish two "classes" of hospitals with regard to construction costs—those that would suffer great hardship if these costs were not reimbursed, and those that would suffer a small enough hardship, in DPW's view, so that they would be required simply to absorb the loss.

The reality is that the federal government instituted a substantial reduction in the amount of its contribution toward payment of Medicaid costs, *see* n.8 above, and at the same time established a new standard giving states even greater flexibility to devise methods of reimbursement in their state plans that would have the effect of implementing the overall reduction in funding. However, the meaning of a reduction in funding is that at some point a provider will not be reimbursed under the new system for costs for which it would previously have been reimbursed. The provider will be forced to pay those costs on its own. That is precisely what has happened in this case under the DPW regulations challenged by Citizens, and the hospital has not established that the regulations in any way conflict with the provisions of 42 U.S.C. §1396a(a)(13)(A).

The analysis of the federal district court in *Friedman v. Perales* on this point is equally applicable here:

> Each of plaintiffs' arguments that the maximum appropriate rental value as applied to Franklin violates the substantive provisions of the Act collapses into the simple but nevertheless erroneous contention that Franklin is entitled to

be reimbursed for the actual, reasonable rental payments it made under its lease and as well for certain insurance premiums and amortized leasehold improvements. Under the efficient cost standard implemented by the Boren Amendment and which applies to the rates at issue, that argument is, quite simply, wrong.

668 F. Supp. at 225 (footnote omitted).

Accordingly, we shall affirm the decision of the office of Hearings and Appeals of the Department of Public Welfare disallowing the costs claimed by Citizens.

## ORDER

NOW, April 25, 1989, the order of the Office of Hearings and Appeals of the Department of Public Welfare at Docket No. 32-85-026, dated May 25, 1988, is affirmed.