604 A.2d 1185

**SUBURBAN MANOR/HIGHLAND HALL CARE CENTER and Golfview Manor Nursing Home, Petitioners,**

v.

**COMMONWEALTH of Pennsylvania, DEPARTMENT OF PUBLIC WELFARE, Respondent.**

Commonwealth Court of Pennsylvania.

Argued April 2, 1990.

Decided March 2, 1992.

130

Charles I. Artz, for petitioners.

Jeffrey P. Schmoyer, Asst. Counsel, for respondent.

Before DOYLE and PALLADINO (P.), JJ., and NARICK, Senior Judge.

DOYLE, Judge.

Before us for consideration is a petition for review of an order of the Pennsylvania Department of Public Welfare (Department) filed by Suburban Manor/Highland Hall Care Center and by Golfview Manor Nursing Home (collectively, Petitioners). By its order, the Department made certain adjustments to Petitioners' cost reports for the fiscal years ending (FYE) June 30, 1981, June 30, 1983 and June 30, 1984. Petitioners' present five issues for our review, which are in fact appeals of five separate adjustments made by

the Department. Three of these adjustments involve depreciation costs, and two involve interest expense.[1]

The facts underlying these appeals are briefly stated as follows. On June 22, 1982, Around the World of Pennsylvania (ATW) purchased certain assets of the Highland Hall and Golfview Nursing Homes from Golfview Suburban Associates (GSA). ATW paid $873,161.13 for Golfview's assets and $1,254,892.79 for Highland Hall's assets. During March 1984 ATW merged with Trade Around the World of Pennsylvania (TAW) and the Department, for auditing purposes, recognized the merger retroactive to July 1, 1983. The Department allocated the total purchase price for each of the two facilities by reference to the cost for each of the three fixed asset categories entered on the prior owner's final cost report. The cost of each asset category was divided by the total cost to obtain percentages, and each percentage was then multiplied by the total purchase price to obtain the allocated amount for each category. The resulting allocations were as follows: of Golfview's purchase price of $873,161, $80,244 was allocated to land, $589,558 to buildings, and $203,359 to equipment; of Highland Hall's purchase price of $1,254,893, $77,552 was allocated to land, $910,199 to buildings, and $267,041 to equipment.

Petitioners first contend that the Department improperly allocated the purchase prices of Golfview and Highland Hall. Specifically, Petitioners contend that the Department should have allocated the purchase price by reference to the values given to each of the three asset categories by

---

1. The activity underlying these appeals is the reimbursement for skilled nursing and intermediate care services provided to medical assistance patients at Petitioners' facilities. Such reimbursements were made pursuant to the regulations in the Department's Medical Assistance Manual for Allowable Cost Reimbursement for Skilled Nursing and Intermediate Care Facilities (Manual) found at 8 Pa.B. 2826–2838 (1978) and 10 Pa.B. 310 (1980). The Manual was codified on July 1, 1983 at 55 Pa.Code §§ 1181.201–1181.274. However, because two of the three cost reporting periods occurred prior to the codification, we will cite only the Manual. The allowable reimbursement is composed of three components, operating costs, depreciation on capital assets, and interest on capital indebtedness.

independent appraisers on or around the time of the sale. In support of this argument, Petitioners refer to Section IV D(9)(f) of the Manual for Allowable Cost Reimbursement for Skilled Nursing and Intermediate Care Facilities (Manual), which provides in pertinent part that:

> The cost basis for depreciable assets of a facility purchased as an ongoing operation shall be the *lesser* of the purchase price *or* the fair market value based on the lesser of at least two bonafide appraisals at the time of the sale and less any straight line depreciation by the prior owner. (Emphasis added.)

This argument is fatally flawed, however, in that it fails to recognize that, under the particular circumstances in this case, and the language of Section IV D(9)(f), appraisals would not be considered in establishing the cost basis for depreciable assets because for both Golfview and Highland Hall, the purchase price was lower than two corresponding appraisals.[2] Therefore, in accordance with Section IV D(9)(f), the cost basis is obtained by subtracting the prior owner's depreciation from the *purchase price*, not from the independent *appraisals*. Because the appraisals were properly disregarded in determining the cost basis for the total assets purchased, Section IV D(9)(f) does not require that the cost basis for the three asset categories, included in the total assets, be determined based upon these appraisals.

 We note that Section IV D(9)(f) could be interpreted to require allocation of the total purchase price of the three categories of assets in accordance with a breakdown supplied in the sales agreement. In the instant case, however, the sales agreement did not allocate the lump sum purchase price among the individual asset categories. In such a situation, the Department may allocate the purchase price using any method which is neither plainly erroneous nor inconsistent with the regulations and underlying stat-

---

**2.** The purchase price for Golfview was $873,161 while the two appraisals were $900,000 and $962,000. The purchase price for Highland Hall was $1,254,893, while the two appraisals were $1,300,000 and $1,320,200.

ute. *Department of Public Welfare v. Forbes Health System*, 492 Pa. 77, 422 A.2d 480 (1980). Accordingly, the Department's allocation of the purchase price by reference to the prior owner's listed costs at the time of the sale, we believe, is a reasonable and proper manner of allocation in that it relies upon historical apportionment of costs to establish present distribution.

Further support for this proposition is provided by Section IV D(9)(b) of the Manual which provides that "[t]he method and procedure for computing depreciation must be applied from year-to-year on a consistent basis." The clear intent of this regulation is to ensure continuity in the determination and reimbursement of depreciation costs. Just as the prior owner was prohibited by Section IV D(9)(b) from "reallocating" his cost basis as the relative values of the asset categories changed, a new owner is prevented by this same method from applying "updated" reallocation percentages to his stepped-up cost basis.

Additionally, Petitioners' reliance upon Section 104.14 of the Medicare Provider Reimbursement Manual (HIM–15) is misplaced. First, Section 104.14A provides that the cost basis for depreciable assets is established from the lower of the current reproduction cost or the fair market value while the Department's regulations at Manual Section IV D(9)(f) provide that the cost basis is based upon the lesser of the purchase price or the fair market value. In this case, the cost basis is determined by reference to the purchase price, a situation not contemplated under HIM–15, which therefore renders it inapplicable. Also, the discussion in Section 104.14B of HIM–15 regarding allocation of a sale price is irrelevant since it relates to the determination of the *seller's* gain or loss on the sale, not the *purchaser's* determination of his cost basis. Since there is nothing contained in HIM–15 which is applicable to the instant situation, Petitioners' assertion that the Department is bound by HIM–15 is erroneous.

■ Finally in this regard, Petitioners' contend that the Department's allocation methodology violates the Act of July 31, 1968, P.L. 769, *as amended*, 45 P.S. §§ 1102–1602, formerly called the Commonwealth Documents Law. The requirements of the Commonwealth Documents Law prohibit the Department from creating reimbursement standards which have no support in the regulations, or from *amending* the regulations through unpublished policy directives. We believe, however, that the methodology applied in this case by the Department to allocate Petitioners' cost basis does not create or amend a regulation, but instead represents a valid interpretation of the substantive regulations allowing for the reimbursement of depreciation expense. *See, e.g., Fair Winds Manor v. Department of Public Welfare*, 100 Pa.Commonwealth Ct. 139, 514 A.2d 642 (1986), *aff'd*, 517 Pa. 106, 535 A.2d 42 (1987).

■ Petitioners' second contention is that the Department improperly considered the amount of depreciation offset by the gain on sale in computing the prior owner's depreciation. The Department's offset of the prior owner's gain on sale against that owner's depreciation costs was made pursuant to Section IV D(9)(e) of the Manual. That Section states that "[g]ains and losses realized from the disposal of depreciable assets, not to exceed 10% of the total allowable depreciation for the year, are an allowable cost."

The Department interpreted and applied Section IV D(9)(e) to require the disallowance of up to 90% of a seller's allowable depreciation costs by the offsetting of any gain on the sale. In the Department's example, if a seller has allowable depreciation in its last year of operation of $50,000, and a gain on the sale of $25,000, the $25,000, being less than 90% of the allowable depreciation, would be offset from the $50,000 of allowable depreciation, resulting in allowable costs of $25,000. Likewise, if the seller's allowable depreciation is $50,000 and his gain on the sale is also $50,000, 10% of the depreciation, or $5,000, would be exempt from the gain offset, but the remaining $45,000, being less than the $50,000 gain, would be offset as a nonallowable

cost. In this case, Petitioners do not contest the gain offset applied to the prior owner's costs, but dispute the inclusion of those disallowed costs in the Department's determination of the prior owner's depreciation, which, of course, affects Petitioners' remaining value of the assets and their future allowable depreciation.

Section IV D(9)(e) provides that gains realized from the sale of depreciable assets "not to exceed 10% of the *total allowable depreciation* for the year, are an *allowable cost*." (Emphasis added.) In other words, the "allowable cost" is determined by subtracting the gain on the sale from 90% of "the total allowable depreciation." The remaining 10% of "the total allowable depreciation" is not subject to a gain offset. As such, the seller's "allowable depreciation" is the audited depreciation *prior to* the gain offset, and not, as Petitioners argue, the amount remaining as an allowable cost *after* the offset.

█ Petitioners' third contention is that the Department, by its computation of the useful lives of Golfview and Highland Hall's assets, improperly disallowed a portion of these facilities' depreciation. Petitioners divide this issue into two sub-issues, the assignment of useful lives, and the application of remaining useful life.[3]

With regard to the first sub-issue, the assignment of useful lives to the new owner, the Department used the useful lives assigned by the prior owner and approved and employed by the Department in the determination of prior years' allowable depreciation. Petitioners contend that, upon acquisition, a new "updated" useful life ("relifing") based on American Hospital Association (AHA) guidelines should be assigned. Petitioners' argument is essentially that for purposes of computing a purchaser's annual depreciation allowance (the cost of the asset minus any salvage

3. As provided in Section IV D(9)(a) of the Manual, useful life is the number of years by which the cost of an asset, minus its salvage value, if any, is divided to determine the annual depreciation allowance. The remaining useful life of an asset is the number of years over which it may continue to be depreciated.

value divided by the "useful life"), the useful life available to the new owner rather than the originally assigned useful life should be used.

However, Section IV D(9)(b) of the Manual states that "[t]he method and procedure for computing depreciation must be applied from year-to-year on a consistent basis." The Department has interpreted this regulation to mean that once an asset's useful life has been properly established by an owner, that life cannot be changed either by that owner *or* by subsequent owners. Thus, while Section IV D(9)(f) of the Manual allows a step-up in cost basis when an asset is sold, the number of years used to determine the allowable annual depreciation (the useful life) cannot likewise be modified, either up or down (*i.e*, for a shorter or longer useful life).

The issue of "relifing" was reviewed by this Court in *Grandview Health Homes, Inc. v. Department of Public Welfare*, 122 Pa.Commonwealth Ct. 356, 552 A.2d 720 (1989). As in this case, the Department in *Grandview* used the useful lives assigned by the prior owner in calculating the facility's allowable depreciation cost, and the new owner asserted that it should be allowed to assign new and revised useful lives. The Department relied upon Section IV D(9)(b) to support its use of the prior owner's assigned useful lives. The new owner argued that because there is no specific prohibition in any of the subsections to Section IV D(9) of the Manual against the assignment of new lives to purchased assets by a new owner as long as the new lives are in accordance with Internal Revenue Service (IRS) or AHA guidelines, the Department could not replace the new lives with the prior owner's assigned lives. However, we rejected this theory and held that:

> Manual Section IV.D.9.b clearly requires that the method and procedure used for computing depreciation must be consistent year-to-year. If asset lives were permitted to be changed, the method and procedure of calculating depreciation would not be consistent. Manual Section IV.D.9.a. conditions depreciation allowance on a require-

ment that asset lives be in accordance with IRS or AHA guidelines. These two regulations must be read together in order to *give effect to both*. *See* 1 Pa.C.S. §§ 1922(2) and 1932. Therefore, if the prior owner did *not* assign asset lives consistent with either IRS or AHA guidelines, a new owner may assign new lives consistent with IRS and AHA guidelines. However, if the prior owner *did* assign lives consistent with IRS or AHA guidelines, [the Department's] use of the prior owner's assigned asset lives in calculating a facility's allowable depreciation gives effect to both Manual section IV.D.9.a. and Manual section IV.D.9.b. and is clearly consistent with Manual section IV.D.9.a.

*Id.*, 122 Pa.Commonwealth Ct. at 368–69, 552 A.2d at 726 (emphasis in original).

Petitioners in this case, however, do not contend that the asset lives assigned by the prior owner and used by the department in its audit adjustments are inconsistent with IRS and AHA guidelines, and they have the burden of proving that the Department's audit adjustments are incorrect. Since Petitioners have neither alleged nor proven that the useful lives used by the Department are inconsistent with IRS or AHA guidelines, the exception outlined in *Grandview* is inapplicable. As such, we reject Petitioners' contention.

■ With regard to the second sub-issue, the determination of "remaining useful life," the Department allowed depreciation on the assets purchased for a period equal to the original useful life of the asset minus the number of years it was or could have been depreciated, *i.e.,* the years of use. Petitioners apparently dispute not the Department's determination of how many years that asset may be depreciated, but instead the Department's method of assigning an asset's useful life. However, a review of the regulations clearly supports the Department's practice. As with the assignment of useful life, Section IV D(9)(b) is applied to require that the number of years left for the allowance of depreciation remains the same upon transfer of the asset. The Department's method of determining and applying "re-

maining useful life" is clearly consistent with and supported by the regulations and therefore will be upheld. *Forbes Health System.* Finally, Petitioners again raise the Commonwealth Documents Law as a bar to the Department's interpretation of its regulations. For the reasons stated *supra,* we reject this contention.

■ Petitioners' fourth contention is that the Department improperly disallowed interest on capital indebtedness relating to debt below the depreciation basis. The arguments presented by Petitioners in this case are identical to those presented in *Grandview,* wherein we addressed this issue extensively. *Grandview,* 122 Pa.Commonwealth Ct. at 360–62, 552 A.2d at 722–23. In *Grandview,* we found these arguments to be without merit, and we reject Petitioners' contention that *Grandview* is wrongly decided.

■ Petitioners' final contention is that the Department improperly disallowed interest expense on the purchase of assets and liabilities acquired from the prior owner's operating company. The assets and liabilities here at issue are those which TAW obtained from Skilled Health Facilities (SHF) for the consideration of $1.00. The total assets acquired consisted of cash, accounts receivable, inventory, prepaid expenses, fixed assets including leasehold improvements, furniture and equipment, vehicles, and accumulated depreciation. Petitioners assumed liabilities for a bank overdraft, notes payable, accounts payable, accrued payroll and other accrued expenses. The Department allowed Petitioners to take depreciation on the depreciable assets. However, it did not consider these assets in determining the percentage of interest disallowance. Petitioners' contention is that the cost and prior depreciation of these assets should be included in this computation.

The interest disallowance percentage relates to that portion of a loan used to finance the excess of the purchase price over the cost basis. HIM–15 Section 203. The difficulty with Petitioners' position is that they have failed to establish that any part of their loan was used to pay for the

assets acquired from SHF. If the loan were not used to pay for these assets, then none of the interest on the loan relates to these assets. If no interest were paid on the loan to acquire these assets, then they cannot be considered in determining the percentage of interest disallowance. Thus the Department allowed depreciation on these assets, but did not recognize them in computing the interest disallowance.

██ Petitioners argue that the Department should view the entire transaction between TAW and SHF as part of one overall transaction which also includes the transaction between ATW and GSA, so that part of the overall loan must be attributed to the purchase price of the SHF assets. However, only one written sale agreement is contained in the record, and that agreement contains only the amount paid by ATW to GSA (approximately $2,100,00) *for GSA's assets.* Whatever transpired between TAW and SHF apparently occurred outside of and apart from this agreement. Further, even if the two conveyances were regarded as one transaction, there is nothing which connects Petitioners' loan with the SHF part of that transaction. In the absence of verification which establishes that a portion of the loan was used to finance the TAW/SHF exchange, the Department acted reasonably and properly in attributing the loan exclusively to the ATW/GSA conveyance. Thus the Department correctly disregarded the TAW/SHF assets in calculating the percentage of interest disallowance.

Accordingly, based on the foregoing, we affirm.

### ORDER

NOW, March 2, 1992, the order of the Department of Public Welfare in the above-captioned matter is affirmed.